**Daniel Anthony DOTSON, M.D. et al., Appellants,**

v.

**TEXAS STATE BOARD OF MEDICAL EXAMINERS, Appellee.**

No. 18302.

Court of Civil Appeals of Texas, Fort Worth.

Oct. 9, 1980.

Rehearing Denied Nov. 6, 1980.

Neal, Sweatt & Teis, Graham, Stubbeman, McRae, Sealy, Laughlin & Browder, Tom Sealy and Joe Greenhill, Jr., Austin, for appellants.

Mark White, Atty. Gen. of Texas, and Bill Campbell, Asst. Atty. Gen., Austin, for appellee.

## OPINION

SPURLOCK, Justice.

Beverly Ann Dotson, M.D. and Daniel Anthony Dotson, M.D. appealed to the District Court from an order of the Texas State Board of Medical Examiners suspending their license to practice medicine for ten years and five years respectively, which order was probated provided they attend a school on drug abuse and did not prescribe drugs of a certain class. The trial court sustained the Board's order and an appeal was perfected to this court.

We affirm.

The Board found that Beverly Dotson, on four specific occasions prescribed Preludin for John T. Richter, alias Johnny Kyle, which drug was non–therapeutic in the manner such drug was prescribed, in that the said John T. Richter had no illness, injury or disease for which the drug Preludin would have had any therapeutic value. The Board found that on eight other specific occasions this doctor prescribed Ritalin tablets to the same person when he had no illness, injury or disease for which this drug would have had any therapeutic value.

The Board further found that Daniel Anthony Dotson on one occasion prescribed Preludin tablets to Richter and on one occasion he prescribed Elavil tablets to Barbara F. Foreman.

The Board further found that on three other occasions Daniel Dotson prescribed Ritalin tablets to Barbara Foreman. The Board further found that on each of these occasions the patient had no illness, injury or disease for which these drugs would have any therapeutic value.

The record before the Board shows that each of the above patients were investigators for the Texas State Board of Medical Examiners, hereinafter referred to as the Board.

Richter came to the Dotson Clinic and asked for Dr. Dan and was referred to Dr. Beverly. He filled out a card as a new patient which had only the information of his name, address, occupation, and who to notify in case of emergency. In a few minutes a nurse took him to an examining room where she took his blood pressure, weighed him, and asked what he wanted to see the doctor for. The patient said he had a headache but "I am 43 years old. I guess I have had it all my life." Dr. Beverly came in and asked him to tell her about his headaches so he told her "I did not have a headache" but "could I talk to her." He told her that he worked for a well service company and worked all night and liked to play around all day and needed something to keep him up. She wrote a prescription and the nurse delivered it to him. He was prescribed Serax.

On the second trip Richter saw Dr. Beverly and again a nurse weighed him and took his blood pressure. Dr. Beverly came in and said something about his headache and he reminded her that he didn't have a headache, that he needed something to keep him up. He told her that Serax was not doing any good and he used to see a doctor in Laredo who gave him fixes and he had prescribed Preludin. Richter said he had also taken Reds, which is Seconal. Dr. Beverly wrote him a prescription on January 6, 1976, for 30 Preludin. On February 19, 1976, following similar procedure, the doctor prescribed 60 Preludin tablets and 30 Valium tablets. On March 10, 1976, following the usual procedure of being weighed, blood pressure taken by the nurse, he was prescribed 60 Preludin and 30 Valium tablets. On April 7, 1976, following similar procedure, he was prescribed 90 Preludin and 30 Valium tablets. On July 14, 1976, following similar procedure, he was prescribed 120 Ritalin tablets.

On April 19, 1977, Richter called the receptionist and reminded her that he was an old patient and needed his prescription and he went by the office and picked up a prescription for 100 Ritalin tablets with three refills marked on it and did not see Dr. Beverly. On each of the following six occasions in which he was prescribed Ritalin, he saw the receptionist, the nurse took his blood pressure and weighed him. Dr. Beverly saw him briefly and gave him the prescriptions.

Barbara Foreman was an investigator for the Board. She saw Dr. Beverly as a patient on September 15, 1978. The receptionist turned her over to the nurse and she told the nurse she wanted a prescription for Ritalin. Dr. Beverly then saw the patient, who told the doctor that she was not sick, that she was working two jobs and wanted Ritalin "to help me stay up" and that she had had Ritalin before. Dr. Beverly placed her fingers on the patient's throat and asked her to swallow and listened to either side of the chest. She said she would call the pharmacy. Dr. Dan then came in and the patient told him she was not having any trouble and wanted some Ritalin. He wrote a prescription for Elavil. On October 23, 1978, she returned to Dr. Dan and she told Dr. Dan that the Elavil slowed her down and she wanted some Ritalin and no discussion was had concerning an illness or injury or medical condition. The doctor wrote a prescription for Ritalin. On two other occasions following this, the same procedure was followed in that she reported to the receptionist, the nurse took her blood pressure and weighed her and the doctor wrote a prescription for Ritalin.

The cases against Beverly and Dan were consolidated by agreement. They are husband and wife and operate the Dotson Clinic.

■ By their first and second points of error the doctors assert error of the trial court in denying injunctive relief and in not setting aside the order of the Board because the fact findings were not reasonably supported by substantial evidence within the meaning of Sec. 19(e)(5) of the Administra-

tive Procedure Act; and the order of the Board constituted an abuse of discretion, and are in excess of the Board's statutory authority. These points are overruled. The findings of the Board are supported by substantial evidence.

The doctors assert the order of the Board should be set aside because the evidence was obtained by entrapment. The only Texas case involving the defense of entrapment by the Board of Medical Examiners was before the court of criminal appeals and the court denied the validity of the defense as a matter of law. *Peery v. State,* 138 Tex.Cr.R. 155, 134 S.W.2d 283 (Tex.Cr. App.1939).

Tex.Penal Code Ann. sec. 8.06 (1974) is as follows:

"(a) It is a defense to prosecution that the actor engaged in the conduct charged because he was induced to do so by a law enforcement agent using persuasion or other means likely to cause persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

"(b) In this section 'law enforcement agent' includes personnel of the state and local law enforcement agencies as well as of the United States and any person acting in accordance with instructions from such agents."

This is a civil action brought by the Board. The Board has no authority to prosecute. The entrapment statute specifically provides for a defense to prosecution and that the conduct charge was induced to do so by law enforcement agents. The investigators were not law enforcement agents as defined by the statute.

■ It follows that the defense of entrapment is not available to the doctors. This point is overruled.

The doctors allege error of the court in that they were not permitted to make a discovery of the material pertinent to the case and, therefore, there was not an impartial trial and they were therefore denied due process.

The record discloses that Dr. Dan testified that he had been furnished copies for several weeks prior to trial of investigative reports and he had gone over them with their attorney. This point is overruled.

■ The doctors contend that excerpts from the Physicians Desk Reference (PDR) were introduced in evidence by a member of the Board without a proper predicate being laid and that they were hearsay.

Dr. Winn, a Board member, read from the PDR. No objection was made at that time. Attorneys for the doctors said they had no objection. Thereafter excerpts were taken from the PDR and placed in evidence. Attorney for the doctors said that they had no comments and "I have no objection to the PDR being offered into evidence for whatever weight it can be given."

Later on the attorneys for the doctors objected to the exhibits which were already in evidence but made no motion to strike the testimony nor the exhibits.

Dr. Beverly testified that she uses the PDR, that originally it had a good use, but it is full of ads and warnings to shift the risk from the drug manufacturer to the doctor. She further testified that a doctor may refer to the PDR as to indications for the use of a drug, the warnings and the adverse effects that may occur. This information contained in the PDR is approved by the Federal Drug Administration.

Dr. Dan testified that the PDR is a source of information concerning prescription medication.

Dr. Irby Fox, who testified on behalf of the doctors, testified that the PDR is a quick reference book.

This point is either waived or became harmless error in view of the other testimony in the record and is overruled.

The doctors further contend the district court erred in failing to reverse the orders of the Board because substantial rights of the doctors were prejudiced by the fact finding based upon statutory language found in Tex.Rev.Civ.Stat.Ann. art. 4505(4)(E) (1976) because the language is

unconstitutionally vague and therefore violates the terms of the Administrative Procedure Act, Art. 6252–13a, § 19(e)(1). This section provides that the orders and findings shall not be in violation of constitutional or statutory provisions. The complaint is that the finding of a particular drug administered under "non–therapeutic in the manner such drug was prescribed." The Board found that it was non–therapeutic because the patient had no illness, injury or disease for which the drug would have any therapeutic value. These findings are in the language of Art. 4505(4)(E). The doctors further complain that the terms of the probation are vague and indefinite.

In the case of *Martinez v. Texas State Board of Medical Examiners*, 476 S.W.2d 400 (Tex.Civ.App.–San Antonio 1972, writ ref'd n. r. e.), the United States dismissed the appeal from this case in 409 U.S. 1020, 93 S.Ct. 463, 34 L.Ed.2d 312 (1972); that court had before it the same contention. A doctor was charged with several counts. One of which was that the above section of the statute was violated in that the doctor had prescribed Amphetamine to two undercover agents of the Board and this was non–therapeutic in the manner the drug was administered. The undercover agents were not given a physical examination and got several refills by request to the doctor's nurse. The doctor contended that Subdivision 4 of Article 4505 is unconstitutionally vague and constituted an unconstitutional delegation of the legislative powers of the Board by allowing the Board members to determine what acts constitute a violation of this subdivision. The court then cited the case of *Jordan v. State Board of Insurance*, 160 Tex. 506, 334 S.W.2d 278 (1960). The Supreme Court had before it Article 1.14, sec. 3 of the Texas Insurance Code authorizing the Insurance Board to refuse or revoke a Certificate of Authority where it shall appear to the Board that the officers and directors or any of them *are not worthy of public confidence.* "It was asserted that this provision was unconstitutional because it lacked sufficiently definite standards whereby the competence, fitness and reputation might be determined and,

thus, vested unbridled discretion in the regulatory body." The Supreme Court rejected this contention and stated the idea embodied within the phrase is reasonably clear and hence acceptable as a standard of measurement. This is the true constitutional test. *Martinez, supra* at 403–404.

■ The court in *Martinez, supra,* stated that the Medical Board is composed entirely of professional members who best know the professional and moral standards required of practitioners. The court affirmed the order revoking the license. The statute and the findings of the Board concern the practice of medicine. The Board is composed of trained medical practitioners. Candidates for license or authorized licensees from the Board are held to standards of medical practice. Among those standards is the proper understanding of a therapeutic use of medication including controlled substances. If a doctor does not possess the requisite expertise to prescribe drugs in a therapeutic manner, he can be prohibited from the practice of medicine. This standard is for the purpose of protection of the public. The statute and the findings are not so vague as to be a constitutional violation.

■ The terms of the suspension are not vague. The doctors' certificates from the Drug Enforcement Administration and the Texas Controlled Substances Registration were revoked and were to be reissued only for the prescribing of drugs under schedules III, III–N, IV and V. They cannot prescribe drugs listed on schedule II and II–N without approval of the Board. In addition thereto, in paragraph 2 of the order there is a list of drugs and drug derivatives that the doctors are prohibited from prescribing. These points of error are overruled.

The court has examined each point of error severally and each is overruled.

Judgment affirmed.